UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

VALERIE ROMAYNE RATLIFF, et al.,

        Plaintiffs,

v.                                                                     No. 1:22-cv-0256 MIS/DLM

CORECIVIC, INC., et al.,

        Defendants.

## <u>ORDER COMPELLING DISCOVERY</u>

**THIS MATTER** comes before the Court on Plaintiff's Motion to Compel. (Doc. 32.) The Motion is fully briefed, and the Court conducted a motion hearing on May 11, 2023. (Doc. 72.) For the reasons explained below, the Court GRANTS the substantive relief sought in the Motion. Defendants shall supplement their response to Plaintiffs' Interrogatory No. 3 and Requests for Production Nos. 1 and 11 by producing the employment applications for Defendants Lubin and Payne and the mortality review in full.

## I.    Background

### A.   Underlying Facts and Procedural History

Plaintiff Valerie Romayne Ratliff, personal representative of the estate of Zachary Miles Asher, and next friend of Zane Miles Asher and Khaleesi Mae Asher, and Plaintiff Alexandra Villa brought this action on February 12, 2022, in New Mexico's Thirteenth Judicial District. (Doc. 1-1 at 5.) The lawsuit relates to the February 18, 2019 death of Mr. Asher while incarcerated at the Cibola County Correctional Center (CCCC), which was operated by Defendant CoreCivic. (*Id.* at 6, 8.) Mr. Asher's death led Defendant CoreCivic to conduct a mortality review. (Doc. 44 at 15–18.) The suit alleges wrongful death, violations of Mr. Asher's Eighth and Fourteenth Amendment rights, and loss of consortium. (Doc. 1-1. at 11–17.) The case was removed to this Court on April

4, 2022. (Doc. 1.) On April 11, 2022, Defendants filed an answer in which they raised, in relevant part, an affirmative defense alleging that CoreCivic "exercised reasonable care in hiring, retaining, supervising, and training employees at CCCC." (Doc. 5 ¶ 15 at 12.)

On November 23, 2022, Plaintiffs served Defendants with their First Set of Interrogatories, Requests for Production and Requests for Admission. (Docs. 23.) On December 6, 2022, Defendants served Plaintiffs with their Responses to Plaintiffs' first set of discovery, then on December 22, 2022, Defendants supplemented their response to their discovery, objecting to nine of Plaintiffs' discovery requests consisting of interrogatories and requests for production. (*See* Docs. 26, 30, 32-1.) On January 13, 2023, Plaintiffs filed a Motion to Compel Defendants' responses to the requests to which Defendants objected. (Doc. 32.) During a status conference held on April 27, 2023, the parties expressed a belief that they would be able to resolve all the discovery disputes except Defendants' Objection to Request for Production No. 1. (Doc. 64.)

On May 2, 2023, the Court ordered the parties to file a Joint Status Report (JSR) apprising it of how many discovery disputes they had been able to resolve. (Doc. 66.) In their JSR, the parties notified the Court that they had resolved all but three issues—Interrogatory No. 3, Request for Production No. 1, and Request for Production No. 11.  (Doc. 67.) The discovery issues related to Interrogatory No. 3 and Request for Production No. 11 concerned the employment applications of Defendants Lubin and Payne. (Doc. 67 at 1.) The dispute related to Request for Production No. 1 involved Defendants' withholding of the mortality review.

On May 26, 2023, Judge Strickland set jury selection and trial for February 12, 2023. (Doc. 73.)

**B.  Disputed Discovery Requests**

Interrogatory No. 3 states: "For each of the individual defendants, please provide the dates of employment, positions held, any complaints for excessive force or misconduct made against them, any formal or informal disciplinary history, and reason for separation." (Doc. 32-1 at 3.) Defendants objected, in part, on the grounds that there were no claims for excessive force or misconduct and that no employees were disciplined as a result of Mr. Asher's death. (*Id.* at 2.)

Request for Production No. 1 states: "Please produce any documents (including handwritten or typed notes) or communications (including, but not limited to any emails, text messages, letters, notes, memoranda) in your possession, concerning or relating to Zachary Asher's incarceration at the Cibola County Correctional Center." (*Id.* at 10.) Defendants objected to the request asserting that any communications are protected by the attorney-client privilege or the work product doctrine. (*Id.* at 10.)

Request for Production No. 11 states: "Please produce a complete copy of the personnel files for each of the individual Defendants in this matter." (*Id.* at 17.) Defendants objected to the request because there was no negligent hiring or retention claim. (*Id.*)

**C.  Parties' Positions Based on their JSR and the May 11, 2023 Motion Hearing[1]**

*i.  Interrogatory No. 3 and Request for Production No. 11*

Plaintiffs only seek to compel the employment applications for Defendants Lubin and Payne. (Doc. 67 at 1.) Plaintiffs argue that the employment applications will be probative of the two individuals' truthfulness. Defendants, however, argue that the Plaintiffs' justification for the applications is speculative and that the applications are not relevant because there is no negligent

---

[1] The Court provides the discovery request at issue in its entirety. However, the only objections the Court includes are those that the parties believed applied to the employment applications—Interrogatory No. 3 and Request for Production No. 11—and the mortality review—and Request for Production No. 1.

hiring claim. (*Id.* at 1–2.) At the motion hearing, the Court asked Defendants to reconcile their position that the applications are not relevant when they raise an affirmative defense claiming they had exercised reasonable care in their hiring practices. (Doc. 72 at 2.) In response, Defendants asserted there is nothing in the applications that would have put CoreCivic on notice of the conduct Plaintiffs allege contributed to Mr. Asher's death, that the applications contain little information that would relate to Defendants Lubin and Payne's truthfulness, and that the applications contain sensitive information for individuals in high-security positions. (*Id.*)

ii.  *Request for Production No. 1*[2]

Plaintiffs seek to compel discovery of the mortality review. (Doc. 32-1 at 10.)  Defendants assert the mortality review is protected under the work product doctrine and as patient safety work product. (Doc. 44 at 18.) At the motion hearing, Defendants argued that the mortality review served a dual purpose of aiding in future litigation and helping other inmates by improving CoreCivic policies and procedures. (Doc. 72 at 3.) Defendants also argue that even though the mortality review contains discoverable facts, the portions of it containing analysis cut against its disclosure (*Id.* at 4.) At the hearing, Defendants conceded that none of the individuals on the panel that created the mortality review were attorneys but claimed that the mortality review was requested by the General Counsel Office. (*Id.* at 3.)

Defendants, for the first time, in their response to the motion to compel assert the patient safety work product privilege, under the Patient Safety Quality Improvement Act (PSQIA) claiming Wellpath, a.k.a. Correct Care—the third-party medical provider at CCCC—is a patient

---

[2] At the May 11, 2023 motion hearing, counsel for the Defendants clarified that the attorney-client privilege aspect of their objection was inappropriate to the mortality review and that only the work product doctrine applied.

safety organization. (Doc. 44 at 18.)[3] Defendants further argue that because Wellpath, a.k.a. Correct Care, is a patient safety organization, the mortality review is patient safety work product and not subject to discovery in a civil proceeding. (*Id.*)[4] At the hearing, however, Defendants conceded they did not raise the patient safety work product defense as an objection to their discovery responses because they did not know of the applicability of the privilege until they were briefing the motion to compel. (Doc. 72 at 4.) Defendants also clarified that Correct Care is not a subsidiary of CoreCivic but was nonetheless was provided a copy of the mortality review. (*Id.*)

Following the hearing, Defendants were ordered to submit the mortality review for an *in camera* review. (Docs. 68, 72.) In the Court's review, it was determined that the nine-page mortality review contained: patient medications, history of medical conditions, a summary of the events on the night of Mr. Asher's death, a list of the individuals who put together the mortality review, and the accounts of five medical staff members with knowledge of the events of the night of Mr. Asher's death.

## II.      Relevant Law

### A.   Standard of Review

Federal Rule of Civil Procedure 26(b)(1) governs the scope of discovery and provides that "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). The term "relevant" is not defined by the rules of civil procedure. However, Rule 401 of the Federal Rules

---

[3] Under the PSQIA, a "patient safety organization" means a private or public entity or component thereof that is listed by the Secretary pursuant to section 299b-24(d) of this title. 42 U.S.C. § 299b-21(4)

[4] Notwithstanding any other provision of Federal, State, or local law, and subject to subsection (c), patient safety work product shall be privileged and shall not be--
**(2)** subject to discovery in connection with a Federal, State, or local civil, criminal, or administrative proceeding, including in a Federal, State, or local civil or administrative disciplinary proceeding against a provider. 42 U.S.C. § 299b-22(a)(2).

of Evidence defines relevant evidence as that which "has any tendency to make a fact more or less probably than it would be without the evidence; and the fact is of consequence in determining the action."

Moreover, "[i]nformation within [the] scope of discovery need not be admissible in evidence to be discoverable." Fed. R. Civ. P. 26(b)(1); *see Regan-Touhy v. Walgreen Co.*, 526 F.3d 641, 649 (10th Cir. 2008) ("Under our rules, parties to civil litigation are given broad discovery privileges."). Parties, however, are not permitted to use discovery to engage in fishing expeditions in the hope of supporting their claims or defenses. *See Landry v. Swire Oilfield Servs.*, L.L.C., 323 F.R.D. 360, 375 (D.N.M. 2018). Proportionality is determined by "considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1).

### B.  Invoking Privilege During Discovery

A party can resist disclosure by asserting a privilege but must expressly invoke the specific privilege by name and describe "the nature of the [withheld matter] in a manner that . . . will enable other parties to assess the [privilege] claim" without divulging the privileged contents themselves. Fed. R. Civ. P. 26(b)(5)(A). If the party seeking discovery contests the privilege's applicability, the Federal Rules of Civil Procedure allow it to request judicial assistance. *See* Fed. R. Civ. P. 37(a)(3). A court will order disclosure unless the party asserting the privilege successfully carries the burden of establishing its applicability. *See, e.g.*, *United States v. Jarvison*, 409 F.3d 1221, 1231 (10th Cir. 2005).

### C. Work Product Privilege

"[W]ork-product materials enjoy a qualified protection from discovery." *Sanchez v. Matta*, 229 F.R.D. 649, 654 (D.N.M. 2004) (citing *Hickman v. Taylor*, 329 U.S. 495, 510 (1947)). Rule 26(b)(3) protects from disclosure "the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation." Fed. R. Civ. P. 26(b)(3). "The attorney work-product privilege is based on the recognition that 'it is essential that a lawyer work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel.'" *Sanchez*, 229 F.R.D. at 654 (quoting *Hickman*, 329 U.S. at 510). By its very nature, the work-product doctrine protects the mental processes of the attorney and allows the attorney to analyze and prepare the client's case. *Id.* The doctrine, however, does not protect facts contained within work product, and Courts will imply waiver when a party voluntarily discloses work product to an entity not covered by the doctrine. *Resolution Trust Corp. v. Dabney*, 73 F.3d 262, 266 (10th Cir. 1995); *United States v. Ary*, 518 F.3d 775, 783 (10th Cir. 2008).

Indeed, the party asserting the work-product privilege "has the burden of proving that the documents or materials were prepared in anticipation of litigation by or for a party or that party's representative." *Sanchez*, 229 F.R.D. at 655 (citing Fed. R. Civ. P. 26(b)(3)). While it is not necessary that the party show that litigation had already commenced or was "imminent," they must demonstrate that "the primary motivating purpose behind the creation of the document was to aid in possible future litigation" that was more than "a remote possibility . . . ." *See id.* (citing *Fox v. Cal. Sierra Fin. Servs.*, 120 F.R.D. 520, 524 (N.D. Cal. 1988)).

## III.   Discussion

### A.  Defendants' affirmative defense allows discovery of employment applications.

As explained above, Rule 26 allows parties to obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense. Fed. R. Civ. P. 26(b)(1). Here, Plaintiffs seek the employment applications to test Defendants Lubin and Payne's truthfulness when they were applying for their positions. (*See* Docs. 32 at 5–8; 67 at 2; 72 at 1–2.) Defendants maintain that Plaintiffs' justification for seeking the employment applications is speculative, especially because Plaintiffs did not allege a negligent hiring claim. (*See* Docs. 44 at 6–11; 67 at 2; 72 at 2.) Defendants further claim that the employment applications are not relevant despite having raised an affirmative defense stating that they followed reasonable care in their hiring practices. *(Id.)*

The Court finds that Defendants addressed only whether the applications would be relevant to Plaintiffs' claims and did not address whether they would be relevant to Defendants' own affirmative defense. Therefore, because Rule Federal Rule of Civil Procedure 26(b)(1) determines relevance based either on the claims in a complaint or the defenses in an answer, the Court finds that the affirmative defense is sufficient to establish that the employment applications are relevant and subject to disclosure and will order the Defendants to provide the applications to Plaintiffs.[5]

---

[5] Although Defendants did not argue that disclosure would not be proportional to the needs of the case, in the motion hearing, the Court asked Defendants whether it would be burdensome to produce the documents and counsel replied that it would not be difficult to disclose the applications. Thus, on balance, the request for documents is proportional to this litigation.

**B.  The mortality review is not work product and must be disclosed to Defendants.**

      i.  *The mortality review contains only unprotected facts, and the work product*
         *privilege was waived.*

It is Defendants' burden to establish that the mortality review is work product, and the Court finds they did not demonstrate that "the primary motivating purpose behind the creation of the [mortality review] was to aid in possible future litigation." *See Sanchez*, 229 F.R.D. at 654. Defendants claim that the mortality review was created at the direction of the General Counsel Office in anticipation of litigation (Doc. 32-1 at 10–11); however, beyond that bare statement, the record is devoid of evidence of how or why the mortality review was ordered. (Docs. 32-1 at 11; 72 at 3.) Not only do Defendants fail to identify anything demonstrating the primary purpose of the mortality review was for litigation, but they also state that the mortality review serves to improve CoreCivic policies and procedures. (Doc. 72 at 3.)

Defendants also argue against disclosure by asserting that the mortality review contains analysis that makes it protected under the work product doctrine. The Court's *in camera* review of the mortality review, however, revealed nothing that could be classified as work product. The mortality review does not state who directed its creation, does not include a lawyer among the individuals who authored it, and does not include any analysis as to liability. Instead, the mortality review only contains patient information, medical history, and accounts of the actions of medical personnel on the night Mr. Asher died.

Defendants did not carry their "burden of proving that the documents or materials were prepared in anticipation of litigation by or for a party or that party's representative." *See Sanchez*, 229 F.R.D. at 654. To be sure, a review of the document revealed only facts related to Mr. Asher's death, which are not protected as work product. *See Resolution Trust Corp.*, 73 F.3d at 266 ("[T]he

work product doctrine . . . does not protect facts concerning the creation of work product or facts contained within work product.")

Moreover, at the hearing Defendants acknowledged that that a copy of the mortality review was provided to Wellpath a.k.a Correct Care, a third party not sharing an attorney client relationship with Defendants' counsel.  Even if the mortality review could have been classified as attorney work product, the disclosure to Wellpath waives the privilege and requires disclosure of the document. *See Ary*, 518 F.3d at 783 ("Courts will imply waiver when a party claiming the protection has voluntarily disclosed work product to a party not covered by the work-product doctrine.")

Therefore, Defendants did not show that the mortality review as a whole is work product, the Court's *in camera* mortality review revealed only unprotected factual material, and, even if the mortality review had been work product in part or in whole, Defendants waived the protection by disclosing the mortality review. Thus, the Court will order that the mortality review be disclosed.

> ii.   *Defendants waived the patient safety work product objection, and the mortality review was not created for a statutorily protected purpose.*

In their response to the Motion to Compel, Defendants claimed the PSQIA's patient safety work product privilege for the first time. (Doc. 44 at 18.) The Court finds that CoreCivic waived the privilege when it did not assert the objection at the time it responded to Plaintiffs discovery request. *See Tech. Sales, Inc. v. Dresser, Inc.*, No. CIV 05-0556 ACT/DJS, 2007 WL 9729240, at *1 (D.N.M. Sept. 19, 2007) ("[A] party who fails to make a timely objection or fails to state the reason for an objection to a request for production has waived any objection.")

Even if Defendants' untimely objection to Request for Production No. 1 asserting protection under the PSQIA were allowed,[6] the Court would require disclosure of the mortality

---

[6] The term "identifiable patient safety work product" means patient safety work product that--

review. Patient safety work product is "any data, reports, records, memoranda, analyses (such as root cause analyses), or written or oral statements" that *must* serve one of three specific purposes.[7] Defendants have maintained they did not claim protection from disclosure of the mortality review under the PSQIA in their original discovery responses because they did not know of the statute's applicability. (Doc. 72 at 4.) Clearly, a party cannot create a document for the purposes of asserting a privilege related to a statute of which the party was unaware. Additionally, the fact the party was unaware of the statute proves that the document was not created pursuant to that law, so the party cannot now seek the statute's protection. Indeed, the statute contemplates that very scenario and states that information collected separately from a patient safety evaluation system is not then transformed into patient safety work product merely because it is reported to a patient safety organization.[8] Simply, under the PSQIA, the mortality review is not patient safety work product because it was not "assembled or developed by a provider *for reporting to* a patient safety organization . . . ." 42 U.S.C. § 299b-21(7)(A)(i)(I) (emphasis added).

---

(A) is presented in a form and manner that allows the identification of any provider that is a subject of the work product, or any providers that participate in activities that are a subject of the work product;
(B) constitutes individually identifiable health information as that term is defined in the HIPAA confidentiality regulations; or
(C) is presented in a form and manner that allows the identification of an individual who reported information in the manner specified in section 299b-22(e) of this title. 42 U.S.C. § 299b-21(2).

[7] **(A) In general**
Except as provided in subparagraph (B), the term "patient safety work product" means any data, reports, records, memoranda, analyses (such as root cause analyses), or written or oral statements--
**(i)** which--
**(I)** are assembled or developed by a provider for reporting to a patient safety organization and are reported to a patient safety organization; or
**(II)** are developed by a patient safety organization for the conduct of patient safety activities; and which could result in improved patient safety, health care quality, or health care outcomes; or
**(ii)** which identify or constitute the deliberations or analysis of, or identify the fact of reporting pursuant to, a patient safety evaluation system.

[8] "Information described in subparagraph (A) does not include information that is collected, maintained, or developed separately, or exists separately, from a patient safety evaluation system. Such separate information . . . reported to a patient safety organization shall not by reason of its reporting be considered patient safety work product." 42 U.S.C. § 299b-21(7)(B)(ii).

## C. The Court will not award fees because Defendants' arguments were substantially justified.

Having resolved the discovery dispute, the Court is left only to determine whether Plaintiffs should be awarded costs and fees for having to file the Motion to Compel. (Doc. 32 at 20.) Generally, unless the nonmovant's litigation position was, inter alia, "substantially justified," Rule 37(a)(5) obligates a federal court to impose monetary sanctions against the party that comes out on the losing end of a motion to compel. Fed. R. Civ. P. 37(d)(1)(A)(ii). Substantial justification requires only a "legitimate position[ ]," *New Mexico ex rel. Balderas v. Real Estate L. Ctr.*, 429 F. Supp. 3d 996, 1008 (D.N.M. December 9, 2019). A legitimate position rests soundly on any "justifi[cation] to a degree that could satisfy a reasonable person." *E.g.*, *Lester v. City of Lafayette*, 639 F. App'x 538, 542 (10th Cir. 2016) (unpublished) (quoting *Pierce v. Underwood*, 487 U.S. 552, 565 (1988)). Indeed, Rule 37(a)(5) sets out an admittedly forgiving standard for determining whether a position is substantially justified. *See* Fed. R. Civ. P. 37(a)(5), Advisory Committee Notes, 1970 Amendment ("On many occasions, . . . the dispute over discovery between the parties is genuine, though ultimately resolved one way or [an]other . . . . In such cases, the losing party is substantially justified in carrying the matter to court.") *But see Pruess v. Presbyterian Health Plan, Inc.*, No. CIV 19-629 KG/JFR, 2022 WL 304571, at *10 (D.N.M. Jan. 12, 2022) (awarding sanctions for "stonewall[ing]" discovery requests with perfunctory answers like "it's a process" or that his clients "are working on it").

The Court finds the circumstances do not justify an award of costs and fees. Plaintiffs argue that Defendants stonewalled on certain issues (Doc. 32 at 20), but the record belies that position. Out of 36 discovery requests, there were disputes related to nine of them. (*See generally* Doc. 32-1.) Of the nine disputed discovery requests, the parties resolved six of them after the Motion to Compel was filed. (Doc. 67.) The ability of the parties to resolve six disputes undercuts Plaintiffs'

claim that Defendants stonewalled them. Moreover, the legal and factual issues involved in resolving the three remaining disputes present close questions on which reasonable minds can certainly differ. Thus, the Court will not award fees related to Plaintiffs filing of their Motion to Compel.

**IV.    Conclusion**

   **THEREFORE**, for the foregoing reasons **IT IS ORDERED** that, **no later than June 14, 2023**, Defendants shall supplement their response to Plaintiffs' Interrogatory No. 3 and Requests for Production Nos. 1 and 11 by producing:

1.   the employment applications for Defendants Lubin and Payne; and

2.   the mortality review in full.

   **IT IS FURTHER ORDERED** that Defendants shall redact personally identifying information pursuant to Federal Rule of Civil Procedure 5.2.

   **IT IS SO ORDERED.**

_____
DAMIAN L. MARTINEZ
UNITED STATES MAGISTRATE JUDGE